## In re Estate of Olga L. Laitinen

[483 A.2d 265]

No. 83-090

Present: Billings, C.J., Hill, Underwood, Peck and Gibson, JJ.

Opinion Filed September 14, 1984

*Peter F. Langrock* and *Susan F. Eaton* of *Langrock Sperry Parker & Wool,* Middlebury, for Appellants.

Law Offices of *Davis & Rounds, P.C.,* Windsor, for Appellees.

**Gibson, J.** Three brothers and a sister of Olga Laitinen (appellants). appealed to Windsor Superior Court the allowance of her last will and testament by the Windsor Probate Court, alleging, in part, that the will was the product of undue influence. The judgment, following trial by jury, was in favor of another sister and niece of Olga Laitinen, and this appeal followed. We affirm.

Olga Laitinen, one of seven brothers and sisters, grew up on the family farm in Chester, Vermont. She later enlisted in the

Army and in 1955, before being sent overseas, executed her will. This will left her estate, including the farm, to her sister Marion McFarland and, alternatively, to Marion's daughter, Bobbe Hoskins.

Appellants allege that appellees McFarland and Hoskins unduly influenced Olga Laitinen at a time when she was suffering and recovering from a mental illness. Appellees, they claim, wrote numerous letters containing false information and defamatory accusations that alienated Olga from the rest of the family and induced her to leave her estate only to the appellees.

Four arguments are presented on appeal. First, appellants allege the trial court erred when it refused to admit letters from Marion to Olga that were dated after the execution of the will. Appellants believe these letters were relevant and should have been admitted for several reasons. They allegedly show Marion had the inclination or disposition to exert undue influence over Olga and that she had the ability to exert such influence. Appellants also argue that the letters might show what had been said in earlier letters that may have been lost. Finally, appellants contend they are admissible to show why Olga did not change her will between 1955 and 1980, the date of her death.

 "In a will case, where . . . undue influence exerted upon such a one. [is a ground] of contest, there are a few and but a few artificial rules to be applied." *In re Esterbrook's Will*, 83 Vt. 229, 241, 75 A. 1, 6 (1910). A general rule, consistently applied in cases of undue influence, is that evidence of such influence must "relate to a time at or near the time of the making of the will." *In re Estate of Mooney*, 117 Ill. App. 3d 993, 999, 453 N.E.2d 1158, 1162 (App. Ct. 1983). Evidence of conduct of the proponent subsequent to the execution of the will is admissible if it tends to show influence at the time the will was executed. *Estate of Baker*, 131 Cal. App. 3d 471, 481, 182 Cal. Rptr. 550, 557 (Ct. App. 1982); *In re Estate of Mooney*, *supra*, 117 Ill. App. 3d at 999, 453 N.E.2d at 1162; *In re Ferrill*, 97 N.M. 383, 390-91, 640 P.2d 489, 497 (1981); *In re Estate of Jones*, 320 N.W.2d 167, 170 (S.D. 1982); 3 W. Bowe and D. Parker, Page on the Law of Wills § 29.78 (rev. treatise 1961). Evidence which tends to show an ongoing relationship between

a testator and a beneficiary occurring before and after execution is relevant and admissible. *In re Ferrill, supra,* 97 N.M. at 391, 640 P.2d at 497.

> Evidence that sheds light on the relationship between the testatrix and a primary beneficiary of the will is relevant in determining the existence of undue influence, even when the evidence pertains to events taking place after the will was executed.

*Id.*; see also *Estate of Baker, supra,* 131 Cal. App. 3d at 481–82, 182 Cal. Rptr. at 557–58 (events occurring after the execution of will were compelling evidence that proponent had continuing control over decedent's thought process for period prior to execution until death) ; *Wilhoit* v. *Fite,* 341 S.W.2d 806, 818 (Mo. 1960) (events taking place subsequent to execution admissible to show general plan by defendant to obtain all decedent's property and to show the continuing relationship between testatrix and defendant) ; *Haines* v. *Hayden,* 95 Mich. 332, 347–50, 54 N.W. 911, 914–15 (1893) (evidence of events subsequent to execution tended to "fortify antecedent indications" of fraud and undue influence) ; *Barton* v. *Beck's Estate,* 159 Me. 446, 454, 195 A.2d 63, 67–68 (1963) (evidence of gifts made after execution admissible to show mental condition of testatrix and the "influences at work upon her" prior to the making of her will until her death). Although never ruling directly upon the issue, this Court stated in *In re Everett's Will,* 105 Vt. 291, 301, 166 A. 827, 830 (1933), that "[e]vidence which tends to show that the beneficiary acquired control over the testator's mind before the will was made, and retained such control beyond the period at which the will was executed, is admissible . . . ." (Citation omitted.)

Thus, in light of substantial authority, we find error in the exclusion of those letters written by Marion McFarland after the execution of the will in 1955. As in *In re Ferrill, supra,* they should have been admitted to show the continuing relationship between the parties and to show that the influence, if any, upon Olga was not a mere isolated occurrence. The subsequent letters may also have been useful to elucidate the nature of any undue influence that took place at the time the will was executed.

■ Even though the exclusion of this evidence was error, "it will not result in reversal unless [appellants] can demonstrate that the claimed error was prejudicial and injured [their] rights." *Frogate* v. *Kissell*, 138 Vt. 167, 168, 412 A.2d 1138, 1139 (1980) (citing *Monti* v. *Town of Northfield*, 135 Vt. 97, 99, 369 A.2d 1373, 1375 (1977)); *Green Mountain Marble Co.* v. *State Highway Board*, 130 Vt. 455, 468, 296 A.2d 198, 206 (1972).

In this case thirty-one letters written after 1952 and prior to 1955 were admitted into evidence. Selected parts of each were read to the jury. The majority of these were written by Marion to Olga and complained of the actions of other family members. Family members were repeatedly accused of "trickery," lying and cheating in an attempt to deprive both Olga and Marion of their share of the family property. Direct accusations were made that other members had "cleaned" the farm of its worth by cutting timber and possibly Christmas trees, that they were seen wearing Olga's clothes, had stolen personal possessions and were generally "up to no good."

The letters written subsequent to the will, but not admitted, continued in the same vein. Counsel for appellants admitted that these letters did not "differ materially in their general tenor" but stated that they contained different factual accusations. These letters alleged, for instance, that members had poisoned Olga's mother and had tried to shoot Marion.

Although the subsequent letters would have been useful to show the continuing nature of the relationship, we think other evidence elicited at trial and already before the jury was sufficient on this point.

During the testimony of Bobbe Hoskins, it was revealed, through a letter written by Bobbe to Olga in 1969 as well as in her oral testimony, that bad feelings and accusations among the family members continued into the early 1970's. There were continued allegations that "the group was really trying to make it rough for [Olga] and trying to get the farm away from [her]," that they were engaged in "sneaky activities," were trying to close the road to the farm, and had acted rudely toward her. She also testified that in 1971 "there was . . . a character assassination . . . ," a lot of gossip as well as jealousy over Olga's ownership of the farm.

In light of this testimony and the letter concerning subsequent events, we conclude appellants suffered no undue prejudice by the exclusion of the letters. There was ample evidence that ill feelings had continued between family members and that Marion and Bobbe sided with Olga. The fact that evidence has been excluded improperly is harmless if it can be shown that it has been admitted at another time or in another form. *Hutchinson* v. *Knowles,* 108 Vt. 195, 204, 184 A. 705, 709 (1936) ; *Goulette's Adm'r.* v. *Grand Trunk Railway Co.,* 93 Vt. 266, 271, 107 A. 118, 120 (1919). The exclusion of the letters, although erroneous, is not reversible error.

Second, on the issue of undue influence, appellants challenge the court's refusal to find suspicious circumstances surrounding the execution of the will. The doctrine of suspicious circumstances may be invoked by the contestants of a will (appellants, herein) "when the circumstances connected with the execution of the will are such as the law regards with suspicion . . . ." *In re Moxley's Will,* 103 Vt. 100, 112, 152 A. 713, 717 (1930). Whether there is sufficient evidence to raise a presumption of undue influence must be decided by the trial court on a case by case basis. *Id.* If there is sufficient evidence which establishes prima facie the existence of such influence, the burden is shifted to the proponent (appellees, herein), "who must show affirmatively that the will was not procured by this means." *Id.* Suspicious circumstances may be found, for instance, if the beneficiary has "procured the will to be made or has advised as to its provisions." *Id.* Certain relationships are prima facie proof of undue influence; among these are the "relation of attorney and client, guardian and ward, and the like . . . ." *In re Estate of Rotax,* 139 Vt. 390, 393, 429 A.2d 1304, 1305 (1981) (quoting *Burton's Admr.* v. *Burton,* 82 Vt. 12, 23, 71 A. 812, 817 (1909)). Also, if "the will is grossly unreasonable in its provisions, and plainly inconsistent with the testator's duty to his family . . . ," the presumption of undue influence may be made. *In re Will of Collins,* 114 Vt. 523, 534, 49 A.2d 111, 117 (1946) ; see *In re Watkins' Will,* 81 Vt. 24, 27, 69 A. 144, 145 (1908).

No such circumstances appear in this case. The execution of the will took place when Olga was apart from her family—the appellees had no involvement in the making of the

will. Indeed, they had no knowledge of its existence until more than fifteen years later. The disposition of property to a sister and niece cannot be said to be "unnatural" and there was no confidential relationship between Olga and Marion of the type found suspect under Vermont law. The court did not err when it ruled, as a matter of law, that no suspicious circumstances existed and, therefore, the burden of proof correctly remained on the appellants.

Appellants next challenge the trial court's instructions to the jury. The court charged the jury that, in deciding whether or not there was undue influence in this case, they might consider "[t]he nature of the testamentary disposition . . . , whether natural or unnatural . . . in connection with other evidence. . . ." Later, it instructed that "Olga Laitinen had the right to dispose of her property as she saw fit, and she had no obligation to divide it in equal shares to all her brothers and sisters. It is only when the will is grossly unreasonable and plainly inconsistent with Olga's duty to her family that the inequality can have any effect on the question of undue influence." Appellants argue that the latter instruction was the wrong standard and conflicts with the former. The instruction was properly objected to at trial.

The jury instructions given here, although perhaps not perfect, do not require a new trial. Earlier in the trial, the court ruled that the circumstances connected with the execution of the will were not suspicious, as a matter of law. See *In re Will of Collins, supra*, 114 Vt. at 533, 49 A.2d at 117. The judge ruled and later instructed the jury that a will leaving property to one sister and a niece was not unnatural or unreasonable. The jury was instructed that if they were to find undue influence they would have to base such a conclusion upon other factors. The provisions of the will, standing alone, did not indicate that undue influence had occurred. Based upon the facts of this case, we cannot say that the instruction was erroneous or overly confusing. " '[A]s a whole it breathes the true spirit and doctrine of the law and there is no fair ground to say that the jury has been misled by it . . . .' " *In re Moxley's Will, supra*, 103 Vt. at 114, 152 A. at 718 (quoting *Fassett v. Town of Roxbury*, 55 Vt. 552, 556 (1883)).

Last, appellants argue that the short time utilized by the

jury to reach a verdict—only sixty-four minutes—indicated that they disregarded or only perfunctorily performed their duty.

"The law does not attempt to prescribe the length of time which a jury should take to arrive at a verdict," *State v. Lumbra*, 122 Vt. 467, 469, 177 A.2d 356, 358 (1962), and "[t]here is no law which requires a jury to deliberate any longer than may be necessary to agree upon a verdict." *State v. Morrill*, 127 Vt. 506, 509, 253 A.2d 142, 144 (1969). There was only one issue to decide in this case—whether the will of Olga Laitinen was the product of undue influence. In light of that fact, we do not find the length of time required by the jury in this case to be unreasonable. *McCrea v. State*, 138 Vt. 517, 521–22, 419 A.2d 318, 320–21 (1980).

*Affirmed.*