[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PLAINTIFF'S APPLICATION TO VACATE ORMODIFY ARBITRATION AWARD
On June 8, 1995, the plaintiff, Cagiva North America, Inc. (Cagiva), filed a revised application to vacate, correct or modify an arbitration award rendered by the Lemon Law panel (panel) in favor of the defendant, Edward Schenk. On May 30, 1995, the court, Moraghan, J., granted the State of Connecticut Department of Consumer Protection's motion to intervene as a party defendant. Schenk and the State urge the court to uphold the arbitrators' decision. Based on the evidence presented at the arbitration hearing, the panel could have reasonably found the following facts.
On May 16, 1992, Schenk purchased a 1992 Ducati 907ie motorcycle from Norwalk Kawasaki Yamaha (Norwalk), an authorized Ducati dealer. (Transcript of March 23, 1995 hearing (Tr.), at 18.) Schenk testified that he began having problems with the bike the day he drove it off the lot. (Tr. at 18.) The clutch made a loud grinding noise, and eventually, the "bike actually locked up while [he] was driving it . . . ." (Tr. at 18.) He brought the bike in to Norwalk for the clutch problem on May 30, 1992. (Tr. at 19.) At that time, he had 464 miles on it. It was in the shop for seven days for that particular repair. (Tr. at 19.) On September 1, 1992, Schenk again returned the bike to the shop for CT Page 11381 a loud grinding noise in the clutch. (Tr. at 20.) He brought it back again on September 16 for the same problem. (Tr. at 21.) On September 28, 1992, the bike was returned to Norwalk again for a clutch defect. (Tr. at 24.) The bike had also begun to overheat. (Tr. at 24.) These four repairs are corroborated by service repair order forms. In connection with the fourth repair of the clutch, the bike remained in the shop for two months, being returned to Schenk on November 23, 1992. (Tr. at 25.)
Over the next year, the bike had electrical troubles but Schenk elected not to return to the shop for repairs. (Tr. at 26.) He did testify at the arbitration hearing, however, that the bike remained in his garage for five weeks during the 1993 season. (Tr. at 67-68.) The next documented visit to Norwalk was on September 23, 1993 for electrical problems. (Tr. at 26.) The visit was precipitated by the fact that the bike would not start. (Tr. at 27.) On July 19, 1994, Schenk again returned to Norwalk for repairs because the bike would not start. (Tr. at 27.) A bent crankshaft was discovered and it was determined that the crankshaft problem was a manufacturing defect caused by a defective starter. (Tr. at 28.) The problems escalated from this point on.
As of December, 1994, Schenk was unable to retrieve his vehicle from the shop as it had not been repaired. (Tr. at 29.) He made numerous calls to the dealer and Cagiva and sent letters and faxes concerning the return of his bike. (Tr. at 29-30.) On December 9, 1994, nearly five months after bringing it in for service, Schenk visited the Norwalk dealership that was to be repairing his bike. (Tr. at 30.) The dealer stated that he was closing his shop "tomorrow so come down and get your motorcycle which is in pieces, in boxes, and you can take it away." (Tr. at 30-31.) While at the Norwalk shop, the manager called Cagiva and instructed them to take the bike back. (Tr. at 31, 95-96.) After the call, Cagiva shifted responsibility for the repair of the bike to Motofix, a New York State Ducati repair shop. (Tr. at 31. Schenk testified that as of January 21, 1994, Motofix had not repaired the vehicle: "[t]hey said they hadn't received parts and didn't know — the bike was still in pieces. I said, fine. On January 27, 1994, I filed for a request for arbitration." (Tr. at 32.)
At the arbitration hearing, Schenk submitted a document indicating that as of the date he filed the request for arbitration, the vehicle had been in the shop for a total of 279 CT Page 11382 days for repairs. Eighty-six (86) days for the clutch and overheating problems, five days for electrical difficulties and 189 days for the crankshaft defect. At the time the bike was turned over to the repair shop for the crankshaft repair, it had been driven roughly 6,200 miles in less than two years.
The 907ie came originally with a twelve month, unlimited mileage warranty. (Tr. at 85.) Schenk testified that the warranty was extended orally on several occasions due to the mechanical difficulties he had with the bike. (Tr. at 60.) Cagiva agreed to cover the final January, 1994, repair as a so-called "good will" repair as a result of the problems that Schenk had experienced with the Ducati. (Tr. at 77-78, 98-99.)
To support his position, Schenk filed with the Panel a notarized letter from Michael Stankiewicz, a riding partner of Schenk's, dated March 20, 1995, that recited: "[t]he bottom line is, I've seen Ed's bike in the shop for over two months at a time. I am a witness to the problems Ed's bike has been plagued with, including a two month repair in September of 1992, the first year he owned the bike. The latest, of course, being the warranted crankshaft repair which began in July, 1994. To this day, the job has never been completed." Schenk also filed a letter from Norwalk that Cagiva's attorney indicated contained information that was favorable to Schenk. (Tr. at 100.) The letter, however, is not included in the record before the court.
Schenk testified that he modified the bike in order to enhance its performance. He added tail pipes and a high output "E Promm" computer chip that affects the fuel mixture, thereby increasing the horsepower. (Tr. at 33-34.) The chip was manufactured by Fast by Verachi. (Tr. at 107-08.) Norwalk indicated to Schenk that the computer chip was appropriate for his 907ie. (Tr. at 36.) Although the chip was fabricated by Fast By Verachi as an after market item, it was sold by Norwalk. (Tr. at 61.) Mr. Groff, Cagiva's sales manager, testified that Fast by Verachi is familiar with Ducati motorcycles and that they are connected with the Ducati racing team. (Tr. at 108.)
After Schenk filed for arbitration, he received a call on his answering machine indicating that he could come and pick the bike up from Motofix. (Tr. at 77.) He returned the call and requested a confirmation that the repairs had been completed; however, none was ever forthcoming. (Tr. at 77.) CT Page 11383
In final arguments before the panel, Schenk argued that he had been forced to repair the clutch on four occasions and that other problems, such as the electrical difficulties and the crankshaft malfunction, had lead to his being unable to use the vehicle for a period of greater than thirty days. As a result, he contended that the malfunctions has substantially impaired his use and the value of the vehicle.
In response, Cagiva argued that the difficulties encountered by Schenk were the fault of the Norwalk dealer. In its statement filed in connection with the arbitration, Cagiva wrote that "CNA [Cagiva] believes that for sometime prior to the termination [of Norwalk], the dealership may not have been providing adequate service to Ducati owners such as Mr. Schenk." Cagiva also argued that it had been deprived of the ability to counter Schenk's contention that the bike had been in the shop for more than thirty days since it was unable to subpoena the employees of the defunct Norwalk shop. Cagiva also argued that the repair orders submitted into evidence were incomplete; therefore, a determination could not be made as to whether the thirty day period had been satisfied. Lastly, Cagiva argued, with respect to the thirty day period, that "[y]ou don't have a document in front of you, other than that self serving document prepared by the petitioner, that substantiates that." (Tr. at 120.)
After considering the evidence, the Panel rendered a decision on March 28, 1995, in favor of Schenk. In connection with the repairs to the clutch, the overheating problem and the electrical difficulties, the Panel determined that the bike had been out of service for 91 calendar days during the two year period subsequent to the delivery of the vehicle. The Panel also found that "the vehicle has been subject to a reasonable number of repair attempts for a defect which substantially impairs the use, value or safety of the vehicle for the consumer." Further, they wrote "that for the duration of the possession of the motor vehicle by the consumer, the consumer had virtually no use of the vehicle." "The panel herewith awards associated costs and attorneys fees that it finds reasonable under all of the circumstances."
As a result, the panel awarded Schenk the following: the contract price of $8,200, not reduced by the mileage on the vehicle; $1,233.35 for finance charges; $489 for sales tax; $52 for title fee; $100 for freight and set up; $97.30 for repairs to the battery; $50 for the lemon law filing fee; and $225 for CT Page 11384 attorney's fees. The total judgment amounted to $10,446.65.
In its revised application to vacate, Cagiva argues that the panel failed to conform its award to the law and so imperfectly executed its duties that a mutual, finite and definite award was not made, in that a motorcycle is not a motor vehicle; therefore, the panel lacked jurisdiction over the claim; the panel failed to obtain a subpoena for Cagiva in order for it to call the Norwalk dealership before the panel; they failed to allow Cagiva a reasonable allowance for Schenk's use of the bike; they failed to rule that Schenk's use of the "E Promm" computer chip amounted to an improper modification of the bike; and they erred in finding the clutch problem continued to exist, that the bike was out of service for 91 days, and that Schenk had "virtually no use" of the bike.
On June 14, 1995, Cagiva filed a brief in support of its application to vacate. On June 16, 1995 and June 23, 1995, the State filed briefs in support of Schenk's claim against Cagiva.
This matter is before the court on Cagiva's application to vacate the arbitration award rendered in favor of Schenk under the new motor vehicle warranty statute known as the Lemon Law, General Statutes § 42-179.
Under General Statutes § 42-179(b), "[i]f a new motor vehicle does not conform to all applicable express warranties, and the consumer reports the nonconformity to the manufacturer, its agent or its authorized dealer during the period of two years following the date of original delivery of the motor vehicle to a consumer or during the period of the first eighteen thousand miles of operation, whichever period ends first, the manufacturer, its agent or its authorized dealer shall make such repairs as are necessary to conform the vehicle to such express warranties, notwithstanding the fact that such repairs are made after the expiration of the applicable period." If the manufacturer is unable to conform the vehicle to the warranties, then the consumer may be granted a range of remedies including a refund. General Statutes § 42-179(d). The term motor vehicle, as contained in § 42-179, "means a passenger motor vehicle or a passenger and commercial motor vehicle, as defined in [General Statutes] § 14-1, which is sold or leased in this state." General Statutes § 42-179(a)(2).
I. Jurisdiction/Statutory Interpretation
CT Page 11385
The first issue raised by Cagiva is that this court has no jurisdiction over Schenk's claims since his vehicle is a motorcycle and not a passenger motor vehicle.
General Statutes § 42-181(c)(4) provides that upon application to the Superior Court "for an order confirming, vacating, modifying or correcting any award . . . [t]he court shall conduct a de novo review of the questions of law raised in the application." Since the jurisdiction/statutory interpretation issue is a question of law; Massameno v. Statewide GrievanceCommittee, 234 Conn. 539, 547, ___ A.2d ___ (1995) (jurisdiction is a question of law); Office of Consumer Counsel v. Departmentof Public Utilities, 234 Conn. 624, 641, ___ A.2d ___ (1995) (statutory interpretation is a question of law); this court must conduct a de novo review of the application of the law by the arbitrators on the issue of whether Schenk's motorcycle is a vehicle as used in the statute. General Statutes § 42-181(c)(4).
In Wilson v. Central Sports, Inc., 40 Conn. Sup. 156, 157-58,483 A.2d 265 (1984), the court found that a motorcycle is within the purview of the Lemon Law as a passenger motor vehicle. Since that time, however, both the Lemon Law and the definition of passenger motor vehicle contained in General Statutes § 14-1
have been amended and changed. Therefore, the question presented to the court is whether the amendments to § 14-1 now cause a motorcycle to be outside the scope of protections guaranteed by the Lemon Law.
It must first be noted that the Lemon Law is a remedial statute which must be liberally construed. Chrysler Corporationv. Maiocco, 209 Conn. 579, 595-96, 552 A.2d 1207 (1989). In 1984, General Statutes (Rev. to 1983) § 42-179(a) defined a motor vehicle as "a passenger motor vehicle or a passenger and commercial motor vehicle, as defined in subdivision (35) and (36) of section 14-1, which is sold in this state." General Statutes (Rev. to 1983) § 14-1(35) defined "Passenger motor vehicle" as "a motor vehicle having a capacity of carrying not more than ten passengers, designed and used for the purpose of transporting persons with their necessary personal belongings." Based on the foregoing statutory sections, the court in Wilson v. CentralSports Inc., supra, 40 Conn. Sup. 157, determined that the definition of "motor vehicle" contained in General Statutes §14-1(26), in title 14 (motor vehicles), could be interpreted to include motorcycles. CT Page 11386
Since 1984 there have been no substantive changes in General Statutes § 42-179 concerning the definition of motor vehicles or the inclusion or exclusion of motorcycles from the protection of the Lemon Law. See General Statutes § 42-179 History. There have, however, been changes in General Statutes § 14-1, which statute has been incorporated by reference into §42-179, relative to the definition of "passenger motor vehicle."
Section 14-1(59), was added by Public Act 90-263, redefining the phrase "Passenger motor vehicle" to include "a motor vehicle used for the private transportation of persons and their personal belongings, designed to carry occupants in comfort and safety, with not less than fifty per cent of the total area enclosed by the outermost body contour lines, excluding the area enclosing the engine, as seen in a plan view, utilized for designated seating positions and necessary legroom with a capacity of carrying not more than ten passengers including the operator thereof." The definitional change of § 14-1(59) was "technical and clarif[ied] various definitions in the bill itself." 33 H.R. Proc., Pt. 28, 1990 Sess., p. 9839, remarks of Rep. Lyons. There is no mention in any of the legislative history connected with Public Act 90-263 of the collateral effects of definitional changes to General Statutes § 14-1. In fact, § 14-1(59) is not even mentioned in the legislative history of Public Act 90-263.
"`As a general rule, the specification, modification or repeal of a statutory provision adopted by another statute through incorporation by reference is inoperative so far as the adopting statute is concerned, in the absence of expressed or implied legislative intent to the contrary. Where a particular statute is incorporated into another statute by specific or descriptive words, the presumption is that the legislature did not intend that modification or repeal of the adopted statute should affect the adopting statute.'' [T]he reason given is that . . . the adoption of a statute by specific reference is an adoption of the law as it existed at the time the adopting statute was passed, and the adopting statute is therefore not affected by any subsequent modification or repeal of the statute adopted." (Emphasis added.) (Citations omitted.) Simmons v.State, 160 Conn. 492, 498-99, 280 A.2d 351 (1971)." Bethel PublicUtilities v. Stony Hill Association, 7 CSCR 1358, 1359 (November 13, 1992, West, J.). CT Page 11387
In the present case, there is no indication that the legislature intended, either expressly or implicitly, to absorb the new definition of passenger motor vehicle into the Lemon Law framework at the time that Public Act 90-263 was adopted. The legislative history indicates that the definitional changes in General Statutes § 14-1 were technical in nature. See Polliov. Planning Commission, 232 Conn. 44, 55, 652 A.2d 1026 (1995) ("[t]echnical amendments are not generally intended to effect substantive changes in the law"). Furthermore, there is no reference in any of the legislative materials reciting Public Act 90-263 to either § 14-1(59) or the effect of the "Passenger motor vehicle" amendment on § 42-179. Therefore, the court finds that the presumption of non-modification of § 42-179
has not been rebutted.
Based on the foregoing, the court incorporates into the Lemon Law the definition of passenger motor vehicle found in Wilson v.Central Sports Inc., supra, 40 Conn. Sup. 157, to include motorcycles. Accordingly, this court has jurisdiction to hear Schenk's dispute with Cagiva.
II. Evidentiary Objections
The arbitrators' powers are set forth in General Statutes § 42-181 (b), which provides, in pertinent part, that "[i]f any motor vehicle purchased . . . fails to conform to such applicable warranties as defined in said section 42-179, a consumer may bring a grievance to an arbitration panel . . . ."
A party not satisfied with a motor vehicle arbitration award rendered by the grievance panel may move to vacate the award pursuant to General Statutes § 52-418. General Statutes §42-181(c)(4). Section 52-418(a) provides, in pertinent part, "[u]pon the application of any party to an arbitration, the superior court . . . shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter CT Page 11388 submitted was not made."
A. Factual Findings
Cagiva attacks the factual findings that the panel relied upon to support its determination that Schenk's bike was a lemon. "`It is established policy of the courts to regard awards with liberality.' (Internal quotation marks omitted.) CostelloConstruction Corp. v. Teamsters Local 559, 167 Conn. 315, 320,355 A.2d 279 (1974). `Every reasonable presumption and intendment will be made in favor of an award of arbitrators and of their acts and proceedings.' Ramos Iron Works, Inc. v. FranklinConstruction Co., 174 Conn. 583, 590, 392 A.2d 461 (1978); O G/O'Connell Joint Venture v. Chase Family Ltd. Partnership No. 3,203 Conn. 133, 145, 523 A.2d 1271 (1987). `Hence, the burden rests on the party attacking the award to produce evidence sufficient to invalidate or avoid it.' Von Langendorff v.Riordan, 147 Conn. 524, 527, 163 A.2d 100 (1960). Thus, a reviewing court must uphold an arbitration award unless it determines that the factual findings of the arbitrators are not supported by substantial evidence in the record. Rydingsword v.Liberty Mutual Ins. Co., 227 Conn. 8, 21, 615 A.2d 1032 (1992)."Almeida v. Liberty Mutual Insurance Co., 234 Conn. 817, 824-25, ___ A.2d ___ (1995); General Statutes § 42-181(c)(4) ("[i]n reviewing questions of fact, the court shall uphold the award unless it determines that the factual findings of the arbitrators are not supported by substantial evidence in the record and that the substantial rights of the moving party have been prejudiced").
"`Substantial evidence will be found to exist if the . . . record supplies a substantial basis of fact from which the court reasonably can infer the fact in issue.' Chmielewski v. AetnaCasualty Surety Co., 218 Conn. 646, 660-61 n. 15, 591 A.2d 101
(1991). `The fact that a possibility exists that two inconsistent conclusions may be drawn from the evidence does not prevent the arbitrators' finding from being supported by substantial evidence.' Allstate Insurance Co. v. Howe, 31 Conn. App. 132,135-36, 623 A.2d 1031 (1993)." Almeida v. Liberty MutualInsurance Co., supra, 234 Conn. 825 n. 9.
There are two alternative avenues to relief under the Lemon Law — a four repair requirement and a thirty day out-of-service requirement. General Statutes § 42-179(e). "If the manufacturer, or its agents or authorized dealers are unable to CT Page 11389 conform the motor vehicle to any applicable express warranty by repairing or correcting any defect or condition which substantially impairs the use, safety or value of the motor vehicle to the consumer after a reasonable number of attempts, the manufacturer shall replace the motor vehicle with a new motor vehicle acceptable to the consumer, or accept return of the vehicle from the consumer and [issue a] refund to the consumer . . . ." General Statutes § 42-179(c). "It shall be presumed that a reasonable number of attempts have been undertaken to conform a motor vehicle to the applicable express warranties, if . . . (2) the vehicle is out of service by reason of repair for a cumulative total of thirty or more calendar days during the applicable [two year] period . . . ." General Statutes § 42-179(e).
The panel found that Schenk's bike had been out of commission for 91 days during the two years after delivery and that fact substantially impaired the use and value of the bike. These findings are supported by Schenk's testimony that he had delivered the bike to Norwalk for clutch problems on four occasions between March 30, 1992 and September 28, 1992. He also brought the bike in on September 28 for temperature problems, and on September 27, 1993 for electrical problems. Based on the testimony and the repair orders submitted to the panel, the arbitrators could reasonably find that these five repairs required the bike to be off the road and in the shop for 91 days and that the use and value of the bike to Schenk were substantially impaired. These findings are also bolstered by the notarized letter from Stankiewicz that indicated the bike was in the shop for at least two months during September and October of 1992.[1]
Moreover, in the stated reasons for its decision, "the panel concludes that for the duration of the possession of the motor vehicle by the consumer, the consumer had virtually no use of the vehicle." The evidence in this case fully supports this finding. As of the date of the arbitration filing, January 27, 1994, Schenk had owned the bike for a total of 607 days; the Panel could have found that the vehicle was in the shop for 279 of those days. Further, Schenk testified that there were substantial periods of time where the bike was disabled but he did not bring it into the shop. Again, Stankiewicz corroborates these difficulties in his notarized letter. Therefore, the panel's finding that Schenk had "virtually no use" of his vehicle is supported by substantial evidence. CT Page 11390
Cagiva further argues that the panel should have determined that by inserting the power enhancing "E Promm" computer chip into the bike and installing baffled muffler pipes, Schenk improperly modified the bike, vitiating his ability to receive Lemon Law protection.
"It shall be an affirmative defense to any claim under this section . . . (2) that a nonconformity is the result of abuse, neglect or unauthorized modifications or alterations of a motor vehicle by a consumer." General Statutes § 42-179(d).
In support of its position, Cagiva argues that its expert, Mr. Groff, a national sales manager knowledgeable in Ducati repairs, supplied a sufficient basis for the panel to find that the modification caused the nonconformity in the bike. However, when Groff was asked by panel member, Carver, whether it was a "matter of conjecture" whether the installation of the chip and the mechanical problems of the bike were related, Groff responded, "Right." (Tr. at 103-04.) Therefore, the panel did not err in finding that Cagiva had not carried its burden of proving that the breakdown of the bike was "the result of" Schenk's installation of the two after market items. General Statutes § 42-179(d)(2).
Based on the foregoing, substantial evidence indicates that the thirty day out-of-service requirement of General Statutes § 42-179(e)(2) has been established, thereby creating Lemon Law liability on the part of Cagiva.
B. Subpoena
Cagiva also argues that the panel erred in failing to acquire a subpoena in order to obtain all of the records of Norwalk. The State responds that Cagiva has not demonstrated that its substantial rights have been violated as a result of the panel's failure to obtain a subpoena.
General Statutes § 42-181(c) provides that the "commissioner may issue subpoenas on behalf of any arbitration panel to compel the attendance of witnesses and the production of documents, papers and records relevant to the dispute." (Emphasis added.) Cagiva's position is that it may have been helpful to hear from the Norwalk shop with respect to repair attempts made on the bike. CT Page 11391
Issues related to the granting or quashing of subpoenas concerning evidence and discovery are generally "entrusted to the discretion of the trial court." United States Trust Co. v.Bohart, 197 Conn. 34, 50, 495 A.2d 1034 (1985). A similar deference is granted to arbitrators in carrying out their duties. See Almeida v. Liberty Mutual Insurance Co., supra, 234 Conn. 824-25 (every reasonable presumption is to be made concerning arbitrators' "acts and proceedings") (emphasis added). As a result, considering the discretionary language of the statute ("may issue subpoenas") combined with the presumptive propriety of the arbitrators' "acts and proceedings," the court finds that it is within the discretion of the arbitrators to refuse to subpoena evidentiary matter.
Therefore, the inquiry the court must make is whether the arbitrators' decision not to request a subpoena is supported by substantial evidence and, secondly, whether Cagiva has established that the failure to obtain a subpoena has prejudiced its substantial rights. General Statutes § 42-181(c)(4).
The question can most easily be answered by examining the prejudice criteria. Cagiva has only offered speculation that the documents and individuals they wished to subpoena would help their cause in any way. Moreover, the Norwalk dealer submitted a letter before the arbitrators that Cagiva's attorney described as favorable to Schenk. Further, Cagiva only mentioned a subpoena during its opening statement before the panel, but failed to renew its request at the close of the hearing. Additionally, there is substantial evidence indicating the vehicle was out of service for a period of time in excess of thirty days within the two calendar years after delivery. See General Statutes §42-179(e)(2). Schenk testified to this fact and the repair orders in evidence further support the Panel's findings. In addition, Schenk introduced before the panel the Stankiewicz statement indicating that the bike had been in the shop for over two months in 1992. Therefore, the court finds that Cagiva has not established that its substantial rights were prejudiced by the panel's decision to not obtain a subpoena, since Lemon Law liability is supported by substantial evidence. General Statutes § 42-181(c)(4).
C. Damages
Cagiva also claims that the panel erred in its calculation of CT Page 11392 Schenk's damages.
The Lemon Law allows the panel to determine "appropriate remedies, including, but not limited to one or more of the following: (1) Replacement of the vehicle with an identical or comparable new vehicle acceptable to the consumer; (2) Refund of the full contract price, plus collateral charges as specified in subsection (d) of said section 42-179; (3) Reimbursement for expenses and compensation for incidental damages as specified in subsection (d) of said section 42-179; (4) Any other remedies available under the applicable warranties, section 42-179, this section and sections 42-182 to 42-184, inclusive, or the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act,88 Stat. 2183 (1975), 15 U.S.C. § 2301 et seq., as in effect on October 1, 1982, other than repair of the vehicle." General Statutes 42-181(c).
"Section 42-181(c) gives arbitration panels wide-ranging discretion to fashion appropriate remedies. See Motor VehicleManufacturers Assn. of the United States, Inc. v. O'Neill,
[203 Conn. 63, 78, 523 A.2d 486 (1987)]. `The expansive nature of this statutory authority for remedial action leaves considerable room for variation in actual practice.' Id. `Remedial statutes are to be liberally construed in favor of those whom the legislature intended to benefit.' Hartford Fire Ins. Co. v. Brown, 164 Conn. 497,503, 325 A.2d 228 (1973)." Chrysler Corporation v. Maiocco,
supra, 209 Conn. 595-96.
Cagiva suggests, however, that the panel's powers under §42-181(d) are tempered by § 42-179(d), which provides "the manufacturer shall . . . accept return of the vehicle from the consumer and refund to the consumer, lessor and lienholder, if any, as their interests may appear . . . (4) all incidental damages as defined in section 42a-2-715, less a reasonable allowance for the consumer's use of the vehicle." General Statutes § 42-179(d). "A reasonable allowance for use shall be that amount obtained by multiplying the total contract price of the vehicle by a fraction having as its denominator one hundred thousand and having as its numerator the number of miles that the vehicle traveled prior to the manufacturer's acceptance of its return." Id.
Cagiva contends that the foregoing reasonable allowance language mandates a reduction in the damage award to Schenk. This same argument was presented and rejected by the court in FordCT Page 11393Motor Company v. Miller, Superior Court, Judicial District of Hartford/New Britain at Hartford, Docket No. 70 40 27, at 8 (June 1, 1993, Sullivan, J.). See also Mercedes Benz v. American UlysisCo., Superior Court, Judicial District of Ansonia/Milford at Milford, Docket No. 04 31 61 (January 21, 1994, Rush, J.) ("[t]he statutory reference to `appropriate remedies, including but not limited to' designated remedies leads the court to conclude thata formula expressed in General Statutes § 42-179(d) does notconstitute a limitation of the powers of arbitrators underGeneral Statutes § 42-181(c)"). (Emphasis added.) In Miller,
the court held that based on the expansive language of 42-181(c) and the broad discretion granted to the panel in fashioning remedies, the reasonable allowance under § 42-179 (c) was left "to the discretion of the arbitrators on an individual case by case basis."[2] Id.
In the present case, the arbitrators found that Schenk had "virtually no use" of his bike. Schenk testified that he encountered difficulties with the bike almost immediately after riding it off of the lot. As a result of the substantial evidence indicating Schenk's inability to use the vehicle, the panel refused to grant Cagiva a reduction in damages for Schenk's travels on the bike.
The Panel's decision is supported by substantial evidence and was within its discretion.
D. Attorney's fees
Cagiva, firing its last salvo, suggests that the panel was without authority to award Schenk his attorney's fees. This argument was summarily rejected in Chrysler Corporation v.Maiocco, supra, 209 Conn. 595-96, where the court wrote "[w]e conclude that when the General Assembly incorporated by reference into the Lemon Laws the `remedies' provided in CUTPA, [General Statutes § 42-110b, et seq.,] and Magnuson-Moss, it intended to authorize Lemon Law arbitrators to award reasonable attorney's fees to consumers who prevail in the arbitration proceeding."
Therefore, the court finds that Cagiva's argument attacking the panel's grant of attorney's fees is without merit.
Based on the foregoing, the court denies Cagiva's application to vacate the arbitration award. Accordingly, the panel's arbitration award is confirmed. See Ramos Iron Works Inc. v.CT Page 11394Franklin Construction Co., supra, 174 Conn. 592 (denial of an application to vacate confirms the award).
Morton I. Riefberg Judge of the Superior Court