**George ECKSTEIN, Oma Jane Lidell Smith, and George H. Lidell, Jr. v. ESTATE OF Mildred Lidell DUNN**

[816 A.2d 494]

No. 01-514

November 4, 2002. George Eckstein, Oma L. Smith, and George H. Lidell, Jr., testator's heirs at law, appeal from a superior court decision to admit into probate the will of their aunt Mildred L. Dunn, in which Joan Teaford Gunterman, the testator's grand-niece, was named the sole beneficiary. They raise two issues for our review: first, whether alterations made to the text of the will are so ambiguous as to render the will facially invalid, and second, whether the superior court erred in failing to find "suspicious circumstances," so as to shift the burden

of proof on the issue of undue influence to the proponent of the will. Because we find that the will was facially valid and that the superior court acted within its discretion in deciding that the will was not made under suspicious circumstances, we affirm.

Mildred Dunn died on August 25, 2000, while a resident at the Equinox Terrace Home in Manchester, Vermont. Dunn was ninety-six and a widow at the time of her death, leaving an estate estimated to be worth two million dollars.

Dating from the 1980s, Dunn sought legal advice from Thomas P. Whalen, Esq. of Manchester. On December 19, 1988, Dunn executed a Last Will & Testament prepared by Whalen. Subsequently, Dunn executed a First Codicil to her will on March 1, 1989, and a Second Codicil on July 16, 1997. According to the estate plan established by the will and the two codicils, Dunn designated a large charitable gift to the Salvation Army and directed that the remainder of her estate be divided among two nieces and two nephews, three of whom are appellants in this action.

In early August 1997, Whalen prepared a "draft" will, at Dunn's request, which incorporated the 1988 will and the two subsequent codicils into one document. He met with Dunn, who requested that he leave the document with her. Whalen then wrote "Draft Copy" at the top, blackened out the date, and left it with Dunn. Whalen again met with Dunn on August 27, at which time he discussed the contents of the "draft" will with her. He concluded that Dunn was of sound mind and memory and able to recognize the objects of her bounty. Dunn stated that she desired more time to review the document before signing it. An appointment for the execution of the will was scheduled for the following week on September 4, 1997. In the meantime, Joan Teaford Gunterman ("Teaford"), Dunn's grand-niece, visited her grand-aunt at the Equinox Terrace sometime during that Labor Day weekend.

Testimony at trial established that Teaford enjoyed a close relationship with Dunn from the time she was six-months old. Their activities together included family holidays and frequent visits during summer vacations. In the summer of 1980, Dunn and Teaford went on a trip to Sweden to explore their family heritage. The trip included visits to the family farm and meetings with relatives living there. After her graduation from college, Teaford lived with Dunn for several months. In 1987, Dunn decided to move from New York City to Dorset, Vermont, and Teaford assisted Dunn with packing and agreed to care for numerous items of personal property for storage and safekeeping. Dunn and Teaford continued to maintain a close relationship, as Dunn frequently visited Teaford in New York. When Teaford got married, Dunn was the matron of honor. This close relationship continued throughout the remainder of Dunn's life.

On September 4, Whalen met with Dunn to execute the will. Phyllis Binkley, who assisted Dunn with her financial affairs, and Teaford were present, although Whalen did not request their attendance at the meeting. Teaford initiated discussion relating Dunn's concerns regarding a bequest of land to the Salvation Army and a bequest of spring rights to Dunn's nephew, George Eckstein. Whalen then requested to meet privately with Dunn. In this private meeting, Dunn stated her desire to make Teaford the sole beneficiary of her will. Despite his opinion of a week earlier that she was of sound mind and memory, Whalen maintained that he became concerned about Dunn's competency. His concern also arose because Dunn appeared rehearsed. As a result, he was unwilling to prepare a revised will to fulfill Dunn's request and concluded the meeting by advising Dunn to give additional thought to the will. Whalen acknowledged that some of the

changes discussed at this meeting were consistent with the modifications which were made to the "draft" will. He also recalled that Dunn had a red pen in her hand during his meeting with her, but that they did not make any changes to the "draft" will at that time.

Dunn retained possession of the "draft" will after the September 4 meeting, and Whalen did not see her again until August 27, 1998, at which time he assisted her in deeding her house in Dorset, and its contents, to Teaford. In the interim, Ann White, Dunn's care-giver, recalled trying to contact Whalen at Dunn's request, for the purpose of getting him to amend the will. Whalen, however, did not recall those attempts. At the August 1998 meeting, according to Whalen, Dunn was alert and decisive in her actions. While they discussed the effect of the deed transfer on her estate plan, they did not review the provisions of the "draft" will. Following the execution of the deed from Dunn to Teaford, Whalen had no further contact with Dunn.

In February 2000, Dunn executed the "draft" will in the presence of three witnesses. Between the time she deeded her house to Teaford in August 1998 and the time she executed her will, Dunn expressed her desire that Teaford, a tennis instructor, be left with sufficient means to maintain the home. Teaford was not present when the will was executed nor did she visit Dunn on that day. Two witnesses at trial testified that during this interim period Dunn frequently reviewed the "draft" will with a red inked pen nearby. With the exception of two annotations made in pencil, all the revisions were in red ink. Mary Ellen Csizmesia, one of the witnesses to the execution of the will, testified that she saw Dunn make numerous changes to the "draft" will prior to its execution and that its text was altered in red ink. At Dunn's instruction, Teaford later delivered the will to a lawyer, Orland Campbell.

## I. Facial Validity of the Will

The first issue raised on appeal is whether the will is invalid on its face. Because the will is undated and includes numerous handwritten alterations, the immediate heirs allege it to be so riddled with ambiguities as to render interpretation unworkable. Consequently, based on the alterations and alleged ambiguities, they maintain that the will is invalid.

This Court views the factual findings of a trial court in the light most favorable to the prevailing party and will refrain from setting them aside unless they are clearly erroneous. See V.R.C.P. 52(a)(2); *Jarvis v. Gillespie*, 155 Vt. 633, 637, 587 A.2d 981, 984 (1991). According to statute, a will does not need to be dated or satisfy any particular form; the law requires that it be in writing, that it be signed by the testator, and that it be attested to by three or more witnesses. 14 V.S.A. § 5. In this case, the record indicates that the will was clearly signed by the testator and properly witnessed by three competent, nonbeneficiary witnesses. The heirs argue that Dunn could not have intended such an informal document to be her will. However, the superior court noted in its decision that Dunn worked on the alterations over a long period of time, under the continued expectation that her attorney would ultimately formalize the draft. The superior court also noted that despite the uncertainty as to whether Ann White attempted to contact Whalen on Dunn's behalf in the period between the September 1997 meeting and the August 1998 meeting, Dunn's desire to change her estate plan was unequivocally expressed, both to Ann White during that interim period and to Whalen at the conclusion of their September meeting. Further, Mary Ellen Csizmesia, one of the three witnesses to the execution of the will, testified that she saw Dunn make numerous changes to the will prior to its execution and that the text of the will was altered by red ink. A handwriting expert

testified that the red-ink writing on the will was consistent with Dunn's handwriting. Whalen also testified that a number of the alterations were in Dunn's handwriting. Furthermore, he acknowledged that some of the changes discussed at the September 4 meeting were consistent with the modifications which were made to the will.

The court's primary objective in a case such as this is to discern the testator's intent. See *Tuttle v. Tuttle*, 112 Vt. 271, 278, 23 A.2d 523, 525 (1942). "To determine such intention, the court is to take the instrument by its four corners, consider it in all its parts, and give effect to its language read in the light of the relation of the parties concerned and the circumstances attending its execution." *In re Trust Estate of Harris*, 120 Vt. 399, 404-05, 141 A.2d 653, 657 (1958). If provisions of a will are ambiguous, the court may consider extrinsic evidence, but ambiguity does not render a will invalid. See *In re Estate of McCoy*, 126 Vt. 28, 30, 220 A.2d 469, 471 (1966) (relying on external matters in enforcing a will with ambiguous instructions). The document in question consists of ten typewritten pages, featuring handwritten red ink deletions, revisions and notations. The top of the first page of the document is entitled "Draft Copy," and the date on the last page is blackened out. There are two printed pencil alterations initialed "M.L.D." in red ink. Many of these alterations are without explanation and leave the dispositive provisions of the will ambiguous. These changes created some uncertainty, but as the superior court noted, they were not sufficient to render the will invalid.

The heirs also contend that, even if the will is not facially invalid, the construction given to the will by the probate court was in error. Specifically, they claim it is impossible to reconcile the validation of the residuary clause with the cancellation of Article Seventh because both provisions are similarly "struck through" and

therefore deleted. Article Eighth is the residuary clause, and its lead-in paragraph is diagonally lined through. The four subsections of the residuary clause have red lines through each provision except for subsection b) which appears: "to my niece Jacqueline W. Teaford" with a line through "Jacqueline W." and "Joan" written above it. Despite these ambiguities, and in light of the circumstances surrounding the execution, the probate court gave effect to the clause and determined that Teaford was the sole residuary legatee.

In maintaining that the superior court erred in adopting the probate court's construction of the will as the "law of the case," the heirs contend that the superior court was required under 14 V.S.A. § 117 to address the proper construction of the will. Section 117 states that a party "*may* bring a complaint before the superior court to have the will construed." 14 V.S.A. § 117 (emphasis added). To properly "preserve an issue for appeal a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it." *State v. Ben-Mont Corp.*, 163 Vt. 53, 61, 652 A.2d 1004, 1009 (1994). The only reference the heirs made to the superior court regarding this issue was in a cryptic footnote in their memorandum of law claiming that construction of Article Eighth will "undoubtedly be the subject of a further proceeding to construe its intent and meaning."

The superior court recognized that construction of the will was properly the subject of review but noted that "[t]he parties have provided no additional briefing with regard to this argument, or the suggestion that it remains to be resolved through further proceedings." Therefore, the superior court addressed the issue "only in passing" and found that there was no basis for disturbing the probate court's construction of the will. This Court will not reverse the trial court when a party's failure to address an issue

below denied the court an opportunity to fairly rule upon the issue. *Agency of Natural Res. v. United States Fire Ins. Co.*, 173 Vt. 302, 311, 796 A.2d 476, 482 (2001) (issue waived when not briefed at the trial court level and no evidence was found in the record). The superior court made no error in determining that the will was facially valid and that the heirs' footnote was insufficient to present the issue of construction.

## II. Existence of "Suspicious Circumstances"

The heirs also contend that the nature of Teaford's interaction with Dunn over the course of the year encompassing the preparation of the will suggests that she exercised undue influence over Dunn. Further, they maintain that Teaford's role requires us to apply the doctrine of suspicious circumstances and transfer the burden of proving an absence of undue influence onto the beneficiary. The superior court left that burden on those contesting the will, stating that "Teaford played but a minimal role in the procurement or preparation of the will." Courts must enforce the testator's intent as expressed in a valid will; however, a will that is shown to be the product of undue influence should not be enforced. *In re Estate of Raedel*, 152 Vt. 478, 481, 568 A.2d 331, 332 (1989). A will is the product of undue influence "when a testator's free will is destroyed and, as a result, the testator does something contrary to his 'true' desires." *In re Estate of Rotax*, 139 Vt. 390, 392, 429 A.2d 1304, 1305 (1981).

Generally, the party contesting a will has the burden of proving undue influence. See *In re Will of Collins*, 114 Vt. 523, 533, 49 A.2d 111, 117 (1946). However, the burden shifts to the proponent of the will "when the circumstances connected with the execution of the will are such as the law regards with suspicion." *Id.* Suspicious circumstances can be found when there is a fiduciary relationship between the testator and the beneficiary. *Raedel*, 152 Vt. at 483, 568 A.2d at 334. Suspicious circumstances may also be present "where a relationship of trust and confidence obtains between the testator and the beneficiary, or where the latter has gained an influence or ascendency over the former." *Collins*, 114 Vt. at 533, 49 A.2d at 117. If such a scenario arises, "the will is presumed to be the product of undue influence, and it will not be enforced unless the proponent persuades the trier of fact that no undue influence attended the execution of the will." *Raedel*, 152 Vt. at 481-82, 568 A.2d at 333.

This Court has found certain exceptions to that presumption. We chose not to apply the presumption where the beneficiaries were children or grandchildren. See *Rotax*, 139 Vt. at 393, 429 A.2d at 1306. We subsequently extended the exception to the presumption to include nephews and nieces where the beneficiaries did not assist in preparing the will. See *Raedel*, 152 Vt. at 484, 568 A.2d at 334. Here the beneficiary was a grandniece of the testator who also rendered some assistance in preparing the will. However, testimony also demonstrated that Teaford enjoyed a close relationship with Dunn over many years, and that both Dunn and her friends commonly referred to Teaford as her niece. The fact that Teaford was her grand-niece is simply a matter of degree of relation, and no distinction should be made from the rationale of *Raedel*. There, the "beneficiaries wanted to inherit the farm, helped care for [the testator] during her illness, urged her to seek legal advice regarding her estate, and discouraged the other heirs from contact with their aunt." *Id.* As a matter of law, this Court found that the circumstances were not sufficient to raise the presumption of undue influence.

"Where the trial court applied its factual findings to the correct legal standard, we will not disturb its conclusion if it is supported by the findings." *Land-*

*mark Trust (USA), Inc. v. Goodhue,* 172 Vt. 515, 519, 782 A.2d 1219, 1224 (2001). Thus, we will uphold the court's conclusion on the question of suspicious circumstances as long as there is sufficient evidence to support it. Testimony at trial demonstrated that Dunn made numerous requests, over a fifteen-year period, for Teaford's advice regarding the changes to her estate plan. Dunn and Teaford discussed the issues regarding water rights to her house and her bequest of land to the Salvation Army. Teaford also saw the will sometime between August 1997 and the Fall of 1998. Apparently, Teaford's visit over Labor Day weekend in 1997 and Dunn's sudden departure from the estate plan he had drafted caused Whalen to refuse to amend Dunn's will to make Teaford the sole beneficiary. However "[w]hether there is sufficient evidence to raise a presumption of undue influence must be decided by the trial court on a case by case basis." *In re Estate of Laitinen,* 145 Vt. 153, 159, 483 A.2d 265, 269 (1984). In this case, the superior court did not share Whalen's concern. Indeed, it noted that the "[c]ontestants were simply unable to demonstrate that Joan Teaford's apparent devotion to Mildred Dunn masked an unscrupulous bid to gain control of her wealth." Further, the record fails to demonstrate that such attention ultimately interfered with Dunn's ability to execute the will in a manner inconsistent with her true desires.

*Affirmed.*